# EXHIBIT A

**VIRGINIA:**

## IN THE CIRCUIT COURT FOR HENRICO COUNTY

| | | |
|---|---|---|
| THE BRINK'S COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| CHUBB EUROPEAN GROUP LIMITED | ) | |
| Serve: | ) | JURY TRIAL DEMANDED |
| Mendes & Mount | ) | |
| 750 7th Avenue | ) | |
| New York, NY 10019 6829 | ) | |
| | ) | |
| CERTAIN UNDERWRITERS AT LLOYD'S, | ) | |
| LONDON SUBSCRIBING TO POLICY NO. | ) | |
| B0901/LI1831111 | ) | |
| Serve: | ) | |
| Mendes & Mount | ) | |
| 750 7th Avenue | ) | |
| New York, NY 10019 6829 | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

## PARTIES

1.     The Brink's Company ("Brink's") is a Virginia Corporation with its principal place of business in Henrico County, Virginia.

2.     Chubb European Group, Limited ("Chubb") is an insurer registered in England and Wales with registered offices at 100 Leadenhall Street, London EC3A 3BP that issued a Comprehensive Crime Insurance policy to Brink's for the period April 1, 2018 to April 1, 2019.

3.     Certain Underwriters at Lloyds, London Subscribing to Policy No. B0901/LI1831111 ("Lloyd's") are certain syndicates and "names" based in London, England or elsewhere who were underwriters of a First Excess Comprehensive Crime Insurance policy to

Brink's for the period April 1, 2018 to April 1, 2019.

    4.      Chubb and Lloyd's agreed to submit to the jurisdiction of a court of competent jurisdiction within the United States, and agreed that service of process for such suit may be made upon Mendes & Mount, 750 7th Avenue, New York, New York 10019.

    5.      Brink's seeks insurance coverage for losses covered by Chubb's policy and Lloyd's excess policy as further explained below.

<strong><u>JURISDICTION AND VENUE</u></strong>

    6.      Jurisdiction is proper in this Court because Brink's is a citizen of Virginia. Chubb and Lloyd's are citizens of foreign states subject to the jurisdiction of this court pursuant to Virginia Code § 8.01-328.1 because Chubb and Lloyd's transacted business in the Commonwealth; contracted to insure Brink's in the Commonwealth; delivered a comprehensive crime insurance policy and an excess comprehensive crime insurance policy in the Commonwealth; and breached both the comprehensive crime insurance policy and the excess comprehensive crime insurance policy in the Commonwealth.

    7.      Venue is proper in this Court pursuant to Virginia Code § 8.01-262 because the cause of action arose in this county. Additionally, Brink's resides in this county and both defendants are non-residents of the Commonwealth.

<strong><u>INTRODUCTION AND FACTUAL BACKGROUND</u></strong>

    8.      Brink's is the world's largest cash management company with a global workforce (as of December 31, 2019) of 62,400 employees and operations in 41 countries. Brink's is headquartered in Henrico County, Virginia.

    9.      Brink's employees handle high value cargo including large amounts of cash, precious metals, bearer securities, diamonds and gemstones. Brink's has typically insured the risk

2

of employee crime through comprehensive crime insurance. Brink's has historically sought such insurance in the London markets.

10.     In 2018, consistent with past practice, Brink's arranged for comprehensive crime insurance and obtained primary coverage with Chubb and first excess comprehensive crime insurance coverage through Lloyds. The Chubb "Elite Fraudprotector" policy is attached as Exhibit A. The Lloyd's First Excess Comprehensive Crime Insurance policy is attached as Exhibit B.

11.     The Chubb "Elite Fraudprotector" policy insures Brink's and its subsidiaries for the period April 1, 2018 to April 1, 2019. *See* Exhibit A. Likewise, the Lloyd's First Excess Comprehensive Crime Insurance policy insures Brink's and its subsidiaries for the period April 1, 2018 to April 1, 2019. *See* Exhibit B.

12.     The Chubb "Elite Fraudprotector" policy provided $10,000,000 coverage for each single loss (with $100,000 deductible). Brink's timely paid the 2018 policy premium of $92,570 (including management and service fees). The Lloyd's First Excess Comprehensive Crime Insurance policy provided coverage for $40,000,000 excess of the $10,000,000 primary policy. Brink's timely paid the $104,850 policy premium in 2018.

13.     The Chubb "Elite Fraudprotector" policy and the Lloyd's First Excess Comprehensive Crime Insurance policy provide coverage for losses discovered during the policy period that were connected to an act or continuous act committed during the discovery period.

## BRINK'S COVERED LOSS

14.     Brink's suffered covered losses as a result of an internal crime committed by its employee, Roiland Gotiangco ("Gotiangco"). Gotiangco was a trusted employee in Brink's New York City office responsible for collections and billing. He had been employed at Brink's since

3

2005 and by 2018 had been promoted numerous time to positions of responsibility. By 2018, Gotiangco's annual salary was over $90,000 and he was classified as a Senior Manager reporting to the Director of Finance in Brink's New York City office.

15.     From at least in or about 2016, through at least July 2018, Gotiangco knowingly and willingly implemented a scheme he had devised to fraudulently and dishonestly defraud Brink's, to steal money and to modify, corrupt, and erase confidential data in Brink's computer systems in furtherance of his scheme to steal money.

16.     Gotiangco used his access to Brink's computer systems to modify, erase, and corrupt Brink's confidential account data by misallocating payments by Brink's customers to other Brink's customers in order to conceal overdue accounts which would result in closer scrutiny of the accounts receivable by Brink's management.

17.     Gotiangco used his access to Brink's confidential computer systems to modify, erase and corrupt Brink's confidential data to conceal the amounts owed by certain customers thereby depriving Brink's of the amounts owed by those customers. This scheme was in furtherance of his overall plan to steal money from Brink's using Brink's computer and financial accounting systems.

18.     By concealing problem accounts from audit, review, and scrutiny by Brink's management, Gotiangco was able to fraudulently transfer nearly $1.25 million dollars from Brink's financial accounts to his four personal credit cards over the relevant period. Brink's was not able to identify these fraudulent transfers because Gotiangco had modified, corrupted, and erased confidential data in Brink's computers and had used his scheme to mislead Brink's management about the condition of Brink's financial accounts.

19.     Gotiangco's related, continuous, and repeated modification, erasure, and corruption

4

of Brink's confidential data to conceal his scheme allowed Gotiangco to obtain an improper financial gain; specifically, nearly $1.25 million which he dishonestly transferred to his personal credit cards.

20.     In August 2018, Brink's senior management confronted Gotiangco about suspicious financial transactions and improper modifications to company financial documents. When confronted, Gotiangco immediately resigned and submitted a handwritten resignation admitting to improper modifications of company financial documents.

21.     Gotiangco was investigated by the Federal Bureau of Investigation (FBI) and indicted on two charges of wire fraud and one charge of aggravated identify theft.  The first wire fraud count related to Gotiangco's falsification of customer records which resulted in transfers to his personal credit cards.  The second wire fraud count related to Gotiangco's modification, corruption, and erasure of customer accounts receivable to conceal amounts owed by certain customers to Brink's in connection with, and in furtherance of, his scheme to fraudulently transfer funds.  Gotiangco has agreed to plead guilty to both wire fraud counts.  His guilty plea is scheduled for the near future.

22.     Brink's gave timely notice to Chubb, through its agent, of Gotiangco's theft in or about September 2018.  In October 2018, Brink's cautioned Chubb's agent that further investigation may identify other losses.  Chubb's agent promptly responded that additional losses would "fall within the definition of a single claim and would 'attach back' to this notification."

23.     Brink's engaged the services of forensic accounting firm KPMG to conduct an internal investigation of Gotiangco's misconduct and to determine the financial impact of Gotiangco's fraudulent and criminal actions.

24.     Through the process of Brink's and KPMG's investigation, Brink's learned that

5

Gotiangco extensively modified, erased, and corrupted Brink's confidential financial records. Consequently, Brink's was forced to engage KPMG to reproduce the confidential accounts, records, and electronic data that Gotiangco had modified, erased, and corrupted. Through this process, Brink's learned that many accounts had been modified and corrupted to the point where the amounts those customers owed to Brink's was lost or uncollectible.

25.     Based on KPMG's investigation, as well as the FBI's investigation and Gotiangco's subsequent indictment and agreement to plead guilty, Brink's concluded that it suffered covered losses as follows:

     a.     Fraudulent sums transferred to Gotiangco's personal credit cards totaled $1,220,078.27;

     b.     Lost and/or uncollectible accounts receivable caused by Gotiangco's fraudulent modification, erasure, and corruption of Brink's confidential computer data totaled approximately $21,765,000.00;

     c.     Costs of labor and computer time required to reproduce Brink's confidential accounts, records and electronic data totaled $4,500,000.00.

26.     When Brink's learned the full quantum of damages, Brink's gave timely and additional notice to Lloyd's agent (who was also Chubb's agent), per the Notice provision of the First Excess Comprehensive Crime Insurance Policy, that Brink's losses could approach $25 million dollars. As noted above, Lloyd's agent had previously agreed that additional losses would "attach back" to Brink's original notice of claim from September 2018.

27.     Chubb paid Brink's $1,120,078.27 for losses incurred from Gotiangco's fraudulent transfer of funds to his personal credit cards. (That amount reflects Brink's losses for Gotiangco's fraudulent transfer of funds to his personal credit cards less the $100,000 policy

deductible.)  Chubb also paid Brink's $100,000 for the fees, costs, charges, and expenses related to KPMG's assistance in preparing a proof of loss.  (This payment is consistent with the "Fees, costs and expenses" section on page 3 of the Chubb "Elite Fraudprotector" policy).

28.     Chubb and Lloyds have failed to compensate Brink's for the remaining losses it suffered under the policies.

## COUNT I:
## BREACH OF CONTRACT BY CHUBB.

29.     Brink's incorporates, by reference, the preceding paragraphs.

30.     Brink's and Chubb entered into an insurance contract.  *See* Exhibit A.  Brink's paid Chubb valuable consideration for the contract.  Chubb, in turn, promised to pay Brink's for losses incurred pursuant to the policy terms.

31.     Brink's incurred losses that are covered by the Chubb policy, specifically:

a.      Brink's incurred approximately $21,765,000.00 in lost and/or uncollectible accounts receivable caused by Gotiangco's fraudulent modification, erasure and corruption of Brink's confidential computer data.  This loss is specifically covered under the policy definition of "Internal Crime," as well as other policy provisions including, but not limited to, exceptions to exclusions (i) and (j) on page 4 of "Elite Fraudprotector" policy; *see* Exhibit A.

b.      Brink's incurred approximately $4,500,000.00 related to the costs of labor and computer time required to reproduce Brink's confidential accounts, records, and electronic data which had been modified, erased, and corrupted by Gotiangco as part of his fraudulent scheme.  This loss is specifically covered under the policy definition of "Internal Crime" as well as other policy provisions including but not limited to d) on page 6 of "Elite Fraudprotector" policy; *see* Exhibit A.

32. Brink's gave Chubb timely notice of its losses. Brink's cooperated with Chubb's investigation. Brink's has not assigned the policy or the rights to it. Brink's has met all conditions precedent to coverage.

33. Chubb breached the insurance contract (*see* Exhibit A) by failing to pay Brink's the losses incurred above.

34. For the foregoing reasons, Brink's respectfully requests that the Court enter judgment on its behalf and award damages that will make Brink's whole.

## COUNT II:
## BREACH OF CONTRACT BY LLOYD'S.

35. Brink's incorporates, by reference, the preceding paragraphs.

36. Brink's and Lloyd's entered into an insurance contract. *See* Exhibit B. Brink's paid Lloyd's valuable consideration for the contract. Lloyd's, in turn, promised to pay Brink's for losses in excess of the Chubb policy up to $40,000,000 per each single loss. The Lloyd's policy expressly incorporated, by reference, the terms and conditions of coverage in the Chubb "Elite Fraudprotector" policy. *See* Exhibit B, "Insuring Clause."

37. Brink's incurred losses that are covered by the Lloyd's policy, specifically:

    a. Brink's incurred approximately $21,765,000.00 in lost and/or uncollectible accounts receivable caused by Gotiangco's fraudulent modification, erasure, and corruption of Brink's confidential computer data. This loss is specifically covered under the policy definition of "Internal Crime" as well as other policy provisions including, but not limited to, exceptions to exclusions (i) and (j) on page 4 of Chubb's "Elite Fraudprotector" policy; *see* Exhibit A.

    b. Brink's incurred approximately $4,500,000.00 related to the costs of labor

and computer time required to reproduce Brink's confidential accounts, records, and electronic data which had been modified, erased, and corrupted by Gotiangco as part of his fraudulent scheme. This loss is specifically covered under the policy definition of "Internal Crime" as well as other policy provisions including but not limited to d) on page 6 of Chubb's "Elite Fraudprotector" policy; *see* Exhibit A.

38.     Brink's gave Lloyd's timely notice of its losses. Brink's cooperated with Lloyd's investigation. Brink's has not assigned the policy or the rights to it. Brink's has met all conditions precedent to coverage.

39.     Lloyd's breached the insurance contract (*see* Exhibit B) by failing to pay Brink's the losses incurred above.

40.     For the foregoing reasons, Brink's respectfully requests that the Court enter judgment on its behalf and award damages that will make Brink's whole.

## AD DAMNUM

41.     Brink's respectfully requests that the Court grant the following relief against defendants jointly and severally:

    a.      Enter judgment in the amount of $26,265,000 in damages or an amount as the evidence warrants;

    b.      Pre-Judgment Interest; and

    c.      Such other relief as the Court deems appropriate.

**BRINKS DEMANDS A TRIAL BY JURY.**

Dated: April 20, 2020          Respectfully submitted,

Robert F. Redmond, Jr. (VSB No. 32292)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, Virginia  23219
rredmond@mcguirewoods.com
T: (804) 775-1123
F: (804) 698-2145

*Counsel for The Brink's Company*



# EXHIBIT A



# Elite Fraudprotector

Commercial Crime Insurance

CHUBB

ACE European Group Ltd.
A Chubb Company
The Chubb Building
100 Leadenhall Street
London
EC3A 3BP

T: 020 7173 7000
F: 020 7173 7800
www.chubb.com/uk

# Elite Fraudprotector

## Schedule

| Policy Number | | | |
|---|---|---|---|
| Item 1 | Policyholder | The Brinks Company | |
| | Principal address | 1801 Bayberry Court PO Box 18110 Richmond, VA 23226-8100, USA | |
| Item 2 | Policy Period | From | 1st April 2018 at 12:01 a.m. |
| | | To | 1st April 2019 at 12:01 a.m. |
| | | Both days inclusive local standard time at the Principal Address | |
| Item 3 | Sum Insured | USD 10,000,000 each single loss | |
| Item 4 | Deductible | USD 100,000 each and every loss USD 250,000 each and every loss in respect of social engineering fraud USD 1,000 each and every loss in respect of **credit card forgery** | |
| Item 5 | Extensions | a) Contractual penalties b) Interest c) Outsourcing d) Extortion | |
| Item 6 | Discovery Period | 60 days | |
| Item 7 | Retroactive date | None | |
| Item 8 | Premium | Total Premium USD 79,500 per annum Centrally-Collected Premium due hereon USD 50,164 Premium collected locally through the ACE Multinational Programme USD 29,336 plus Service Fees USD 7,044 Central Programme Management Fee USD 5,000 (payable to Chubb) | |
| Item 9 | Premium due date | | |
| Item 10 | Territorial Limits | Worldwide | |
| Item 11 | Jurisdictional Limits | USA | |

For and on behalf of ACE European Group Ltd., a
Chubb Company

Date

UK0499D-A0

1

This contract is subject to US state surplus lines requirements. It is the responsibility of the surplus lines broker to affix a surplus lines notice to the contract document before it is provided to *you*. In the event that the surplus lines notice is not affixed to the contract document *you* should contact the surplus lines broker.

## Our obligation to you

This policy is our promise to you to pay for your loss if:-

   a loss of a type described under *what has gone wrong* is **discovered** and notified to *us* during the **policy period** or **discovery period,**

   the loss is covered under *What does the policy pay,*

   the loss is not excluded under *What is not covered.*

We shall not rescind or avoid this policy in whole or in part, for any reason, nor shall we assert any other remedy, for any actual or alleged breach save as for where there has been a fraudulent breach of the duty.

*Our* promise is also subject to the conditions set out under *General Matters.*

## What has gone wrong?

*You* have suffered a loss because of:-

   **internal crime,**

   **external crime,**

   **damage to your premises,**

   **loss in transit,**
   **credit card forgery, or**

   **social engineering fraud.**

## What does the policy pay?

*We* will pay up to the sum insured for loss (as described below) which *you* suffer as a result of an act or acts described under *What has gone wrong,* but we will not pay for loss referred to under *What is not covered.*

The loss that *we* will pay must be direct financial loss sustained by *you* anywhere in the world in connection with a single act or series of related, continuous or repeated acts of **internal crime** committed by one or more of *your* **employees** or an act of **external crime** committed by persons who are not *your* **employees.**

The loss will include the direct financial loss sustained by a **client**, which is **discovered** during the **policy period**, or the **discovery period**, as a result of *you* suffering an **internal crime** or an **external crime** and where *you* have responsibility for the care, custody and control of the **money, securities** or **property** of any **client**, unless caused by an **employee** in collusion with a **client** or any employee thereof.

The loss must be sustained prior to the end of the **policy period** and be **discovered** by *you* prior to the end of the **policy period** or the **discovery period**, if applicable.

*You* must pay the **deductible** for any loss or series of related, continuous or repeated losses.

## Fees, costs and expenses

*We* will pay for any **fees, costs, charges and expenses**. Such payments will be part of and not in addition to the **sum insured**,and subject to the **deductible** as specified in Item 4 of the schedule.

## Extensions

Any/All of the extensions below, where selected, will form part of, and not be in addition to, the **sum insured** as specified in

Item 3 of the Schedule:

a)  **Contractual Penalties:** *we* will pay the amount of any penalty (other than punitive penalties) assumed and enforced against *you* under written contract, resulting directly from a loss covered by this policy.

The amount in respect of such penalties is subject to a 10% sub-limit of the **sum insured** specified in Item 3 of the Schedule to this Policy and is subject to the relevant **deductible**.

b)  **Interest:** *we* will pay interest that *you* would have received or any interest that *you* are legally obliged to pay to a client (other than interest under a written contract) because of a covered loss. Interest is payable for the period between when the covered loss occurred and when it was **discovered** calculated as of the date the loss is **discovered**. *We* will not pay interest under any written contract.
The amount in respect of Interest is subject to a 10% sub-limit of the **sum insured** specified in Item 3 of the Schedule to this Policy and is subject to the relevant **deductible**.

c)  **Outsourcing:** the policy is extended to include **employees** of any company to whom *you* outsource services (including but not limited to payroll, computing or accountancy services) under a written contract and subject to *you* being able to prove that the company to whom *you* outsource has been checked for their honesty, competence and financial stability and that you retain the right to audit their services. This extension shall only apply in deductible of any other insurance or indemnity agreements which are held by, or recoverable by, such outsourcing company..

d)  **Extortion:** *we* will pay for any loss, excluding all costs, charges and expenses, of monies or property paid by *you* as a result of the communicated threat to do bodily harm to a director, **employee**, partner, or relative or to commit an act or acts covered under **computer crime and restoration costs** provided that prior to the surrender of any money, securities or property the employee receiving the threat has reported the threat or demand to a director, officer or manager and that *you* have reported the matter to the police.
*We* will not pay for any payments in respect of negotiation or investigation, medical or travel costs, medical fees or other ancillary expenses incurred by *you* in respect of any extortion.

## What is not covered?

*We* will not pay loss for:--

a)  fines, penalties or damages for which *you* are legally liable except for compensatory damages arising from a loss covered by this insurance and contractual penalties as set out under Item 5 Extensions.

b)  any loss that *you* have **discovered** before the commencement of the **policy period**.

c)  loss caused by or involving any person(s) who actively **control(s)** *your* business at the time such loss is sustained.

d)  loss caused by an **employee** after *you* became aware that they have committed acts of fraud, dishonesty, or criminal damage. This exclusion will not apply if the person who **discovers** such acts is in collusion with the **employee**.

g)  indirect or consequential loss, including but not limited to income or profit, other than as may be agreed under item 5 Extensions. ·

h)  any sort of nuclear reaction, nuclear radiation or radioactive contamination.

i)  loss of confidential information, though *we* will cover loss where confidential information has been the subject of theft or used to help to commit an act covered by this insurance.

j)  loss resulting directly or indirectly from any credit arrangement, **false accounting**, trading in securities, commodities, futures, options, currencies, foreign exchange or the like unless the loss is a result of **internal crime**, which results in an **employee** or another person or organisation in collusion with such **employee** making an improper financial gain other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pension or any other employment benefits. any loss caused by an **employee** unless covered under **internal crime**.

l)  loss resulting directly or indirectly from, or in any way involving, armored car or courier services provided by the *you*. For purposes of this exclusion, armoured car or courier services include the transfer of any **money, securities** or other **property** by armoured car or courier vehicle, and the pickup, delivery and storage of such money, securities or other **property**.

m)   loss resulting directly ro indirectly from fire, except:

  i) loss or damage to **Money, Securities,** or **Property;** or

  ii) damage to any safe or vault caused by the application of fire as covered under **damage to your premises.**

## Your obligations to us

*You* should understand that *you* have a number of obligations to *us* that arise before *we* insure *you;* during the policy period; and when a problem arises.  These obligations are described below:

### During the policy period

*We* will not make any payment under this insurance unless *you* have paid the premium by the agreed date specified in Item 9 of the Schedule.

*You* must tell *us* promptly if one or more of *you* merge with another business. In addition *you* must tell us if anyone acquires more than 25% of the voting shares of the business of any one of *you.*

If *you* whilst the policy is in force establish any additional offices, other than by consolidation or merger with, or purchase or acquisition of assets or liabilities of, another organisation, such offices shall be automatically covered hereunder from the date of such establishment without the requirement of notice to *us* or the payment of additional premium for the remainder of the premium period.

**Automatic Acquisitions:** *We* will automatically extend cover for ninety days for any newly acquired or formed **subsidiary** from the date of acquisition or formation provided that any such company is under *your* **control.**
For cover to continue to be provided *you* shall advise *us* within such ninety day period of any acquisitions or formations for *our* written agreement if the assets and liabilities of such newly acquired or formed **subsidiary** amount to more than 25% of *your* consolidated assets and liabilities as of the most recent calendar year-end preceding the effective date of this policy.

If the assets and liabilities of such newly acquired or formed **subsidiary** amount to less than 25% of *your* consolidated assets and liabilities as of the most recent calendar year-end preceding the effective date of this policy, cover shall be afforded for loss that is both discovered, and for which all acts giving rise to the loss occur in their entirety, on or after the effective date of acquisition or formation provided that any such company is under *your* **control.** Such coverage shall be afforded without additional premium charge for the remainder of the premium period and without notice having to be given to the Underwriter.

*We* will discuss with *you* any appropriate changes to *your* coverage and any additional premiums that are to apply.

## How to advise us of a loss

. You shall inform *us* as soon as practicable and in any event within the Policy Period or the **Discovery Period,** of discovering a loss at:

Chubb European Group Limited
100 Leadenhall Street
London
EC3A 3BP
(E-mail:uk.claims@chubb.com)

*We,* or a duly appointed representative, will then liaise with *you* concerning the steps to be taken in respect of the loss.

*You* shall provide *us* with full and accurate information about any loss or potential loss of the type described under *What has gone wrong.*

If *you* knowingly submit a fraudulent claim or loss, then we may elect to terminate this policy and have no liability to pay any sums in respect of the fraudulent claim. Any claims or losses already reported will remain validly paid so far as they are free of intentional fraudulent conduct on your part. Termination will only be effective against that entity submitting the fraudulent claim and the policy will remain in force against all other entities.

## How we will calculate your loss

When calculating the loss that *we* pay under this policy the valuation of direct financial loss shall be determined by:-

a)   the highest quoted market value of **securities** at the close of business on the day that *you* **discover** the loss, or the cost of replacing the **securities**. In addition the premium for issuing any lost instruments bond which may be required. If such **securities** cannot be replaced or have no quoted market value, or if such privileges have no quoted market value, their value shall be determined by agreement or arbitration.

b)   the lesser of the cash value of other property at the time of the loss or the cost of repairing or replacing it with property or material of similar value or quality. If *you* hold the property as a pledge or collateral for a loan then the cash value will be that which *you* agreed and recorded when *you* made the loan. If this value is not recorded then the unpaid portion of the loan plus accrued interest will be the cash value.

c)   the rate of exchange applying to a foreign currency as published in *The Financial Times* on the date that *you* **discover** the loss. If there is no such rate published on that day and *you* and *we* cannot agree the appropriate rate of exchange, the rate will be determined by arbitration as described under *General matters c)*.

d)   the cost of blank books, blank pages, data media or other materials and the cost of labour and computer time required for the copying or transcription of data in order to reproduce books of accounts, records and electronic data.

*You* must pay the **deductible** for each loss or series of related, continuous or repeated losses.

If a recovery is made after a loss then the proceeds, less the actual cost of making the recovery, will be distributed as follows:-

a)   first, to *you* for any amount of the loss which exceeds the **sum insured** and the **deductible** combined;

b)   second, to *us* for any payment made by *us*; and

c)   third, to *you* for the amount paid as the **deductible**.

After *we* have indemnified you for your losses under this policy *we* will be subrogated to *your* rights of recovery in respect of the payment. *You* must execute all papers and do whatever is necessary to secure any rights including the execution of any documents to enable *us* to bring a suit in *your* name whether before or after a payment by *us*, at our cost.

If a loss involves property that *you* do not own *we* may settle the claim with the owner, with *your* prior written consent.

In respect of a loss resulting from a **social engineering fraud** where bank account details have been independently verified by *you*, by telephone or email with such customer, client, vendor or employee using only the contact details previously provided by them *we* will pay 75% of the loss that *you* suffer above the excess and 25% of the loss will be allocated to *you*.

## Each loss limit

Payment of any loss will not reduce *our* liability for other loss. However, *our* maximum liability for any single loss will not exceed the amount specified as the **sum insured**. All loss flowing from the acts of the same person or group of persons in collusion will be a single loss and will attract a single **deductible**. This will be the case whether such loss involves one or more of the problems set out under *What has gone wrong*, involves one or more incidents of loss or is sustained in one or more **policy periods**.

Regardless of the number of years that this policy is in force or whether it is or may be renewed and of the number of premiums paid, the **sum insured** shall not be cumulative from year to year or period to period. By accepting this policy *you* are considered to have given notice to *us* cancelling any prior policy issued by *us*.

## Meaning of the policy terms

References in this policy to *we*, *our* or *us* are references to ACE European Group Ltd., a Chubb Company. References to *you* or *your* are references to the **insured**.

Throughout this policy document *we* have highlighted words in bold type. The special meanings of such words are described below:-

**Banking Premises** means the interior of that portion of any building or buildings occupied by any bank, trust company or similarly recognized place of safe deposit.

**Client** means a customer to whom the **insured** provides goods or services either under a written contract or for a fee.

**Computer Crime and restoration costs** means:-

a) the loss of *your* **money, securities or property** under the direct or indirect control of a **computer system** by dishonest or fraudulent manipulation of computer hardware, software programmes or systems, any intentional, unauthorised and fraudulent entry of data or any intentional, unauthorised and fraudulent change of data by any person to which system *you* have not given authorised access;

b) the loss of *your* **money, securities** or **property** from an account which *you* maintain at a financial institution following dishonest or fraudulent electronic, telegraphic, cable, teletype, tested telex, telephone or written instructions to debit, transfer or deliver funds from such account. These instructions must appear to have been given by *you* or someone to whom *you* have given authorisation, but actually have been fraudulently transmitted, issued or fraudulently altered by another.

c) *your* liability to settle payment with *your* telephone service provider as a direct result of dishonest, fraudulent and deliberate unauthorised accessing of a private branch exchange, voice mail processor, automated call back attendant or **computer system** with similar capacity, which is;

   i) owned or leased by *you*, and

   ii) used for the direction or routing of telephone calls in a voice communication network provided always that such system is protected by a system access code which is changed at least once every 30 days and which is designed to provide authorisation to access the system in order to perform security functions, system administration and maintenance functions.

d) the dishonest or fraudulent intentional and wilful use of computer, network or electronic commerce services to erase, destroy, modify or corrupt *your* data or to deny users access to *your* computer, network or electronic commerce services.

e) the reasonable expenses incurred or fees paid by the *you* for the cost of:

   i) computer time, computer programmers, consultants or other technical specialists as are reasonably necessary to verify and substantially restore **electronic computer instructions** or **electronic data** to their previous levels of operational capability; and

   ii) labour for the actual transcription or copying of **electronic data** from source documents furnished by the *you* in order to reproduce such data, when such instructions or data have been intentionally and maliciously damaged or destroyed due to a computer virus or by any other fraudulent act by a natural person, whether or not an **employee** , while such **electronic computer instructions** or **electronic data** are stored within the *your* **computer system** or recorded upon electronic data processing media located within the *your* **premises**; provided *you* are the owner of such instructions or data or are legally liable for such loss or damage and provided you are unable to reproduce same from back-up copies.

If any loss is covered under **computer crime and restoration costs**, then only one deductible shall apply.

**Computer system** means a computer and all input, output, processing, storage and communication facilities and equipment which are connected to such a device and which the operating system or application software used by *you* and are under *your* direct operational control. Off-line media libraries are deemed to be part of such **computer system.**

**Control(s)** means a person or entity, who is entitled to exercise more than 50% of the rights to vote at a general meeting of *you* or who can control the appointment of directors who are able to exercise a majority of votes at meetings of the board of directors of *you*.

**Counterfeiting** means an act by a person, other than an **employee**, which causes *you* to act upon or give value for a negotiable instrument that is an imitation of an authentic negotiable instrument and which deceives *you* into believing that the imitation is the authentic original negotiable instrument.
Instruments which contain fraudulent misrepresentations of fact but are genuinely signed or endorsed are not counterfeit for the purposes of this insurance.

**Credit card forgery** means loss discovered by you during the **policy period** and directly caused by **forgery** or alteration of, on or in any written instrument required in connection with any credit card issued to you or, at your request, to any partner, officer or **employee**; provided, however, that you will fully comply with the provisions, conditions and other terms under which such credit card shall have been issued.

**Damage to your premises** means damage to any of your **premises** or property caused by actual or attempted theft, robbery, safe burglary provided you are the owner or are legally liable for its loss or damage.

**Deductible** means the amount which *you* must retain of each and every loss, or series of related losses,  which is stated in Item 4 of the Schedule.

**Discover, Discovery or Discovered** means the time at which the Director of Risk Management and Insurance becomes aware of an act or acts which a reasonable person would assume to be a loss covered by this policy. *We* should be informed of any such acts though the exact amount or details of the loss may not be known.
Knowledge possessed by any one of *you* will be deemed to be discovery by all of *you*.

**Discovery Period** means the period stated in Item 6 of the Schedule to this policy immediately following expiry, termination or non-renewal of this policy. Within this time *you* may report any loss which *you* have **discovered** that was connected to an act committed during the **policy period**.

**Electronic Data** means facts or information converted to a form:

a) useable in a computer system

b) which does not provide instructions or directors to a computer system; and

c) which is stored on electronic data processing media for use by electronic computer instructions.

**Electronic Computer Instructions** means a set of related programs that direct the operations and functions of a computer system and allow such system to act upon or create **electronic data**.

**Employee means**

a) Any person in *your* regular service whom *you* compensate by wages, salary, fees and/or commissions and/or who *you* have the right to direct and control in the performance of this service.

b) any of *your* directors, trustees, managers, consultants or person holding a similar position in an organization chartered in a jurisdiction other than the United States whilst performing acts coming within the scope of the usual duties of an **employee**.

c) any student, secondee, volunteer or temporary personnel supplied by outside agencies whilst performing services for *you*.

d) any contractor but only when performing acts coming within the scope of the usual duties of an **employee**.

e) any professionally qualified lawyer, accountant retained by *you*, or any employee of such lawyer, solely whilst performing services on
*your* behalf under the retainer.

f) any trustee, fiduciary, administrator or officer of any plan established by *you* and falling within the definition of **insured**.

g) any of *your* retired or former employees working under written contracts.

h) any employee for a period of sixty days immediately following termination of their service unless termination of their employment was as a result of an **internal crime** which would have been covered under this or a similar policy of insurance.

i) any employee whom *you* are unable to identify but who has caused *you* to sustain a loss provided that the evidence submitted proves beyond reasonable doubt that the loss was due to an act of an employee despite not being identifiable by name.

j) partner(s) whilst performing acts coming within the scope of the usual duties of an employee. However, for any loss arising from fraudulent acts of partner(s), *we* will deduct from the amount that *we* will pay in respect of such a loss the amount(s) equal to the financial value of the partner's equity share as determined by the closing value of your books of account as of the date of the **discovery** of the loss by *you* or any partner not in collusion with the fraudulent partner.

**External Crime** means an act or acts, committed by a person who is not one of *your* directors, officers, trustees or employees, of:

a) **counterfeiting**;

b) **Forgery**;

c) **fraudulent alteration**;

d) **fraudulent payment instruction**;

e)   theft;

f)   computer crime and restoration costs

which results in *you or your client* sustaining a direct financial loss.

External crime also includes disappearance, damage or destruction directly causing the loss of **money or securities** whilst such **money or securities** is within **premises** or **banking premises**.

**Fake Person** means a person purporting or claiming to be, or impersonating:

      (a)    an **employee** authorised to instruct other **employees** to transfer, pay or deliver property, **money** or **securities**;

      (b)    a **vendor**; or

      (c)    a **client**,

      but who is not such **employee**, **vendor**, **customer** or **client**

**False Accounting** means the creation, recording or concealment of financial results or transactions with the intention of giving, or which results in, a misleading or deceptive statement of *your* financial condition.

**Fees, Costs, charges and Expenses** means:

a)   reasonable auditors', solicitors' or other specialist or professional persons' fees, costs, charges and expenses (other than internal costs and salaries) incurred by *you* with *our* prior written consent in order to investigate, identify or defend a covered loss or otherwise prepare your proof of a covered loss.

      Fees, costs, charges and expenses incurred to investigate or otherwise prepare your proof of loss are subject to a sublimit of USD100,000 for each and every loss, but not exceeding USD500,000 in the aggregate for the **policy period**.

and/or

b)   reasonable fees, costs, charges and expenses to verify, reconstitute or remove data or programs.

For the avoidance of doubt, these fees, costs and expenses are only recoverable from *us* provided a loss, covered by this policy, is sustained.

**Forgery** means the signing or endorsing or copying of the signature in the name of a genuine person by another person without authority and with the intent to deceive.
Such signature must have been written on a cheque, draft, promissory note, a credit card, a credit card transaction slip, a bill of exchange, or similar written promise, order or direction to pay, received, given, made, drawn by drawn upon by *you or your agent* in consequence of which *you* have acted or transferred funds or goods causing *you* to sustain a loss.
A signature which is a mechanical or electronic reproduction is treated the same as a handwritten signature.

It does not include a genuine signature applied without authority.  A signature may be hand-written, mechanically, or electronically produced or reproduced.

**Fraudulent Alteration** means a material alteration to an instrument (including money orders) for a fraudulent purpose by a person other than the person who prepared the instrument.

**Fraudulent Payment Instruction** means

a)   a fraudulent electronic, telegraphic, cable, teletype or telephone instruction to a financial institution which purports to have been transmitted by *you*, but which was in fact fraudulently transmitted by someone other than *you* and without the *your* knowledge or consent; or

b)   a written instruction (other than those described in a) above) issued by *you*, or which purports to have been issued by *you*, but which bears or purports to bear the original handwritten signature of two authorised **employees** and which was in fact fraudulently issued or was forged or altered by someone other than *you* and without *your* knowledge or consent;

either of which instruction directs the financial institution to initiate a payment from a **transfer account**.
**Insured** means the policyholder and is deemed to include:-

a) all subsidiary companies existing at or before the inception date (or subsequent renewal date) and in respect of which *we* have received a proposal form.

b) any subsidiary companies acquired or created after the inception date (or subsequent renewal date) from the date of such acquisition as agreed under *Your obligations to us b) Automatic Acquisitions*.

c) any subsidiary company who ceases for any reason to be a subsidiary company during the policy period for any internal crime or external crime which occurs prior to the date of cessation. If this policy is a renewal of a prior policy or policies issued by *us* in a continuous sequence then *we* will cover any internal crime or external crime occurring prior to the date of cessation provided that this date is no more than two years prior to the inception date of this policy.

c) any plan which *you* maintain on behalf of *your* employees other than any plan organised under the rules or regulations of the Employment Retirement Income Security Act of 1974 and any amendment thereto.

Internal Crime means any act or acts of fraud or dishonesty

a) committed by an employee which causes *you* to suffer a direct financial loss

b) committed by an employee colluding with a person or persons who are not employees which causes *you* to suffer a direct financial loss

c) committed by an employee which cause *you* to suffer a loss as a result of the intentional or willful use of *your* computers or network services to steal money, securities or property or to erase, destroy, modify or corrupt data or to deny users access to *your* computer, network or electronic commerce services. For the avoidance of doubt, recklessness or inadvertence do not constitute intent.
Internal crime also includes theft from any employee welfare or pension benefit plan.

For the purposes of this policy, gain by an employee in the form of salaries, commission, fees, bonuses, promotions, awards, profit sharing, pension or other employment benefits do not constitute a covered loss under internal crime.
Loss in transit of money, securities or property caused by theft, disappearance, damage or destruction while in transit anywhere and in the custody of; any employee (or while temporarily within their home) or an armored motor vehicle company.

Money means currency, coins, bank notes and bullion, cheques, travellers cheques, registered cheques, postal orders or money orders held for sale to the public.Plan means any pension or employee benefit plans which *you* maintain on behalf of *your* employees. Payments for any loss will be made direct to the plan and a Nil deductible will apply.

Policy period means the period of time from inception to expiry date in Item 2 of the Schedule.

Premises means that portion of the interior of any building occupied by the insured in conducting its business.

Property means tangible physical property other than money or securities.

Policyholder means the entity named in Item 1 of the Schedule.Retroactive Date means the date specified in Item 7 of the Schedule.

Securities means all negotiable and non-negotiable instruments or contracts, including any note, stock, bond, debenture, evidence of indebtedness, share or other equity or debt security, representing either money or property, but does not include money.

Social engineering fraud means an act or acts by a fake person acting alone or in collusion with others, of taking your money or securities with the intention of permanently depriving you of its use, which is committed by means of that fake person deceiving an employee into transferring, paying or delivering such money or securities.

Subsidiary means a company or other entity of which the policyholder has control.

Sum insured means our limit of liability in respect of loss being the amount specified in Item 3 of the Schedule to this policy.

Theft means a dishonest and unlawful act of a person of taking your property, money or securities with the intention of permanently depriving *you* of its use or obtaining a financial gain for themselves.

**Transfer account** means an account maintained by the **insured** at a financial institution from which the **insured** can initiate the transfer, payment or delivery of **money** or securities:

a)     by means of electronic, telegraphic, cable, teletype, tele facsimile or telephone instructions communicated directly or through an electronic funds transfer system; or

b)     by means of written instructions (other than **forgery** establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system;
provided the **transfer account** is supported by a written agreement between the **insured** and a financial institution that authorises the institution to rely on such instructions to make transfers, establishes the names of the **insured's employees** authorised to initiate such **transfer account** and also establishes an instruction verification procedure other than voice recognition.

**Vendor** means a person that provides, or has provided, goods or services to you under a legitimate pre-existing arrangement or written agreement.

## General matters

a)     This policy is a single contract of insurance between *us* and the **policyholder** and is for the benefit of all of *you* as joint insured parties. Accordingly, without limitation:-

    i)     the **policyholder** will act for itself and for all of *you* for all purposes under this policy;

    ii)     payment of any loss under this policy to the **Insured** shall fully release *us* with respect to that such loss;

    iv)     any loss sustained by any one **Insured** to the benefit of another Insured would not be covered.

b)     For the purposes of this policy, an inventory shortage or profit and loss calculation are not sufficient to establish that *you* have suffered a loss because of an act or acts described under *What has gone wrong*.

d)     This insurance shall be governed by the Laws of the Commonwealth of Virginia, USA and Jurisdiction shall be per LMA 5020 Service of Suit Clause naming Mended & Mount, New York for service of process.

e)     It is agreed that in the event of *our* failure hereon to pay any amount claimed to be due hereunder, *we* hereon, at *your* request, will submit to the jurisdiction of a Court of competent jurisdiction within the United States in accordance with the rules of the American Arbitration Association. Nothing in this Clause constitutes or should be understood to constitute a waiver of *our* rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

This Clause is intended as an aid to compelling arbitration or enforcing such arbitration or arbitral award, not as an alternative to such arbitration provision for resolving disputes arising out of this contract of insurance (or reinsurance).

It is further agreed that service of process in such suit may be made upon

Mendes & Mount,
750 7th Avenue,
New York 10019 6829
USA

and that in any suit instituted against any one of them upon this contract, *we* will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of *us* in any such suit and/or upon the request of *you* to give a written undertaking to *you* that they will enter a general appearance upon *our* behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, *we* hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of *you* or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

d) Where an Insured has other insurance or an indemnity agreement in place to recover any loss, this policy will only provide cover in deductible of such other arrangement. If the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this policy will apply to that part of the loss not recoverable or recovered under the other insurance or indemnity. This policy will not be subject to the terms of any other insurance, deductible

e) The insurance may be cancelled for any one of *you* or all of *you* if *you* or *we* give the other thirty days written notice. If this insurance is cancelled in respect of all of *you*, we will return a pro rata amount of premium unless *you* have **discovered** a loss before the cancellation takes effect.

f) The insurance may be cancelled for any one of *you* or all of *you* if *you* do not pay the premium by the date specified in Item 9 of the Schedule within 60 days of inception. In this event *we* will give you thirty days written notice and *we* will be entitled to treat this insurance as if it had never existed.

g)

h)

i) *You* may not assign this policy or the rights to it unless *we* have agreed in writing.

j) *We* shall not be deemed to provide cover, shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose *us* or *our* parent, to any sanction, prohibition or restriction implemented pursuant to resolutions of the United Nations or the trade and economic sanctions, laws or regulations of the European Union, United Kingdom, or United States of America.

k) No knowledge or information possessed by *your* Director of Risk Management & Insurance will be imputed to, or for any reason (including under the law of principal and agent) deemed to be possessed by or the knowledge of any other **insured**.

m) In the event that *we*:

i) cease underwriting; or

ii) are the subject of an order or resolution for winding up or formally proposes as scheme of arrangement; or

iii) have *our* authority to carry on insurance business withdrawn; or

iv) have our financial strength rating reduced by A.M. Best's, Standard & Poor's or equivalent rating agency to less than A-;

*you* may terminate *our* participation on this risk forthwith by giving notice and the premium payable to *us* shall be pro rata to the time on risk. In the event there are any notified, reserved or paid losses or circumstances, premium shall be deemed fully earned. Any return of premium shall also be subject to a written full release of liability from *you*.

## Complaints Procedure

We are dedicated to providing you with a high quality service, and want to maintain this at all times. If you feel that we have not offered you a first class service or you wish to make an enquiry regarding this insurance, please contact the intermediary who arranged this insurance for you or the relevant Chubb contact dealing with your policy.

If you are dissatisfied with the final response to your complaint the Financial Ombudsman Service (FOS) may be approached for assistance in certain circumstances. A leaflet explaining its procedure is available on request.

The FOS's contact details are:

The Financial Ombudsman Service
Exchange Tower
Harbour Exchange Square
London E14 9SR
Telephone: 0800 023 4567
Email: complaint.info@financial-ombudsman.org.uk

This complaint procedure is without prejudice to your right to take legal proceedings.

## Financial Services Compensation Scheme

In the unlikely event of us being unable to meet our liabilities, you may be entitled to compensation under the Financial Services Compensation Scheme.

Their contact details are:

Financial Services Compensation Scheme
10th Floor, Beaufort House
15 St Botolph Street
London EC3A 7QU
Telephone: 0800 678 1100 or +44 20 7741 4100

## Prudential Regulation Authority / Financial Conduct Authority

ACE has acquired Chubb, creating a global insurance leader operating under the renowned Chubb name.

ACE European Group Limited registered number 1112892 registered in England & Wales with registered office at 100 Leadenhall Street, London EC3A 3BP.

Authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority. Full details can be found online at www.fca.org.uk/register

# Endorsements

## Endorsement 1 – Global Insurance Programme Endorsement

### Insuring Agreement

Notwithstanding anything contained herein to the contrary:

A.   Where a Local Policy is required by applicable law but prior to the incurring of a Subsidiary Loss such a policy had not in fact been issued; or

B.   Where a claim is made under a Local Policy and is rejected as not being within its policy terms and conditions ("DIC cover"); or

C.   Where a Local Policy had been issued but its limit of indemnity becomes exhausted by payments made in part satisfaction of a Subsidiary Loss ("DIL cover"),

The Insurers will indemnify the First Named Insured for its Insured Loss the value of which is conclusively agreed and shall be equal to the Subsidiary Loss.

### Conditions applicable to this Endorsement

1.   The total aggregate liability of the Insurers for all direct financial loss and physical loss of or damage to Property sustained by the Insured (including Insured Loss), irrespective of the number of claims or number of Insureds who claim under this Policy shall be the Overall Aggregate Limit of Indemnity set out in the Schedule.

2.   Where a Local Policy has been issued, any payment made by any such Local Policy towards a Subsidiary Loss shall be deducted from the calculation of Insured Loss payable by virtue of this Endorsement.

3.   The total amount of all payments made under this Policy and any Local Policy (ies) or any combination thereof shall not exceed the Limit of Indemnity set out in the Schedule.

4.   Where a Local Policy has been issued the amount of any applicable retention shall not exceed the retention set out in the Schedule.

5.   If any provision in this Endorsement is held to be invalid or unenforceable in any relevant jurisdiction in any given situation it shall not as a consequence be invalid or unenforceable in any other jurisdiction or situation.

6.   The Insurers will treat any Subsidiary Loss in accordance with all of the terms and conditions of this Policy as if the Subsidiary Loss occurred to the First Named Insured.

7.   Matters known to the Subsidiary shall be deemed to be known to the First Named Insured.

8.   The First Named Insured shall, when directed by the Insurers:

a.   retain in its own name, but at the Insurers' expense, a loss adjusting expert ("loss adjuster"), authorized in the jurisdiction in which the Subsidiary Loss occurred and approved by the Insurers, to adjust the Subsidiary Loss;

b.   where permitted by applicable law, grant the Insurers the full right to collaborate with such loss adjuster;

c.   grant the Insurers full access to any records produced by such loss adjuster; and

d.   obtain the right to control the investigation, adjustment, defence and settlement of a Subsidiary Loss, including access to books, records, bills, invoices, vouchers and other information.

9.   The First Named Insured shall use best endeavours to ensure that the Subsidiary shall, to the extent permitted by the laws and/or regulations to which the Subsidiary is subject, do and concur in doing and permit to be done all such acts and things as may be necessary or reasonably required by the Insurers for the purpose of enforcing any rights and remedies, or of obtaining relief, indemnity or settlement sums from other parties in each case in priority to the insurer with whom the Local Policy is written.

In the event any such recovery is subsequently received by the Subsidiary in respect of which a payment or settlement is or has been made by the Insurers to the First Named Insured in relation to a Subsidiary Loss, the First Named Insured shall immediately pay to the Insurers a sum equivalent to such payment or settlement.

### Additional Definitions

| | |
|---|---|
| First Named Insured | means the entity first named in the Schedule |
| Insured Loss | means the decrease in value of the Subsidiary, either directly or |

through intervening subsidiaries as a result of a Subsidiary Loss

**Local Policy(ies)**  means an insurance policy relating to the coverage provided under the Policy, issued as an integral part of this multi-jurisdictional insurance arrangement by a local Insurer in countries where the Insurers are not permitted to provide the insurance

**Subsidiary**  means any subsidiary company of the First Named Insured engaged in financial services [or any other entity including the First Named Insured's own pension funds listed in the Schedule]

**Subsidiary Loss**  means any loss incurred or paid by a Subsidiary which would be considered a covered loss under the terms and conditions of this Policy

Endorsement 2 —Foreign Entity Loss Endorsement

It is hereby noted and agreed that, and notwithstanding anything contained herein to the contrary:

(a) the Company will indemnify the First Named Insured for an Insured Loss, the value of which is conclusively agreed and shall be equal to:

(1) where at the time of the Foreign Entity Occurrence the Ownership Interest is a Controlling Interest, the Foreign Entity Loss; or

(2) subject to paragraph (b) below, where at the time of the Foreign Entity Occurrence the Ownership Interest is not a Controlling Interest, the Ownership Interest multiplied by the Foreign Entity Loss.

(b) if, at the date of the Foreign Entity Occurrence :

(1) the First Named Insured does not have an Ownership Interest or has an Ownership Interest which is not a Controlling Interest but the First Named Insured or an intervening subsidiary is responsible:

(i)   for reimbursing the Foreign Entity for the Foreign Entity Loss; or

(ii)  for obtaining Insurance for the Foreign Entity pursuant to some form of responsibility which the First Named Insured or an intervening subsidiary has in relation to the Foreign Entity; or

(2) the First Named Insured has an Ownership Interest which is not a Controlling Interest and the First Named Insured or an intervening subsidiary is responsible for obtaining Insurance for the Foreign Entity,

(an "Obligation"),

the Company will indemnify the First Named Insured for the Insured Loss, the value of which is agreed and shall be deemed conclusively to be equal to the Foreign Entity  Loss to the extent that the First Named Insured has an Obligation to pay.

(c) The Company will treat any Foreign Entity Loss in accordance with all of the terms and conditions of this Policy, including, but not limited to, exclusions and other limitations in this Policy, as if the Foreign Entity Loss occurred to the First Named Insured.

(d) Information material to this insurance which is known to the Foreign Entity shall be deemed to be known to the First Named Insured.

(e) The First Named Insured shall, when directed by the Company:

(1) retain in its own name, but at the Company's expense, a loss adjusting expert ("loss adjuster"), authorised in the jurisdiction in which the Foreign Entity Loss occurred and approved by the Company, to adjust the Foreign Entity Loss;

(2) where permitted by applicable law, grant the Company the full right to collaborate with such loss adjuster;

(3) grant the Company full access to any records produced by such loss adjuster; and

(4) obtain the right to control the investigation, adjustment, defence and settlement of a Foreign Entity Loss, including access to books, records, bills invoices, vouchers and other information.

(f) The First Named Insured shall make best endeavours to ensure that the Foreign      Entity shall, to the extent permitted by the laws and/or regulations to which the Foreign Entity is subject, do and concur in doing and permit to be done all such acts  and things as may be necessary or reasonably required by the Company for the purpose of enforcing any rights and remedies, or of obtaining relief, indemnity or settlement sums from other parties in each case in priority to the Company with whom the Local Policy is written.

In the event any such recovery is subsequently received by the Foreign Entity in respect of which a payment or settlement is or has been made by the Company to the First Named Insured in relation to the Foreign Entity Loss, the First Named Insured shall immediately pay to the Company a sum equivalent to such payment or settlement.

Definitions applicable to this Condition:

First Named Insured means the Insured named first in the Schedule.

Foreign Entity means an entity (located in a country or territory in which the Company is not lawfully permitted to insure that entity) in which the First Named Insured has an economic interest as a result either of benefiting financially from the continued operation of the Foreign Entity or of being prejudiced by loss or damage to or liability of a Foreign Entity or its business or for which the First Named Insured is responsible for arranging Insurance.

**Foreign Entity Loss** means the damages and Legal Costs that a Foreign Entity has incurred or become legally obligated to pay because of injury, damage, loss, or liability to which this Insurance would apply if the First Named Insured were directly liable for such amounts.

**Insured Loss** means the decrease in the value of the economic interest of the First Named Insured in the Foreign Entity as a result of the Foreign Entity Loss.

**Foreign Entity Occurrence** means an event which may result in a Foreign Entity Loss.

**Ownership Interest** means the percentage ownership interest that the First Named Insured has in the Foreign Entity, either directly or through intervening subsidiaries.

**Controlling Interest** means an Ownership Interest which is either

(i) greater than 50 per cent.; or
(ii) greater than 15 per cent. provided it is the largest shareholding in a Foreign Entity.

All other terms and conditions shall remain unchanged.

**Endorsement 3 – Tax Compensation Endorsement**

It is hereby noted from inception, that the following is added to the policy wording:

It is agreed that the Underwriter shall adjust the amount of any loss paid in the United States to compensate for additional Federal or State tax liability incurred by the Insured as a result of the payment of such loss in the United States rather than in the country in which such loss was sustained, provided that:

    a.  The loss was sustained by an entity not subject to United States or state tax provision; and

    b.  The payment for such loss is reportable income under the Internal Revenue Code and    regulations of the tax laws of any state or commonwealth of the United States.

Loss payment shall be adjusted using the following formula:

$$\text{Final} = \text{Loss Payment} \times \frac{\text{One (minus) the Marginal Foreign Tax Rate}}{\text{One (minus) the Sum of The Marginal United States And State Tax Rates}}$$

Where:

"Final Payment" means the amount paid after the tax adjustment described in this endorsement.

"Loss Payment" means the amount to be paid prior to the tax adjustment described in this endorsement.

"Marginal Foreign Tax Rate" means the marginal rate of income taxation of the **Insured** entity which sustained the loss for the tax year in which such loss is written off.

"Marginal United States and State Tax Rates" means the marginal rates of Federal and State income taxation of the **Insured** which pays the loss in the United States for the tax year in which such loss is written off and shall include, if any, foreign tax credits accruing as a result of such loss.

Nothing contained in this endorsement shall be construed to increase the Underwriter's liability above the amount set forth in the Limits of Indemnity or decrease the Underwriter's liability below the original amount of loss payment.

The Insured shall cooperate with any attempt by the Underwriter to pay the loss directly to the entity sustaining the loss.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Bond or Policy, other than as above state.

All other terms and conditions remain unaltered.

**Endorsement 4 - Brink's Sicherheit GmbH (Germany)**

It is hereby noted and agreed that Brink's Sicherheit GmbH (Germany) is excluded from this policy.

All other terms and Conditions shall remain unchanged.


**Endorsement 5 – Specific Matter**

It is hereby understood and agreed that no account is taken of the matter first discovered by *you* on 21st October 2012 , (hereinafter known as the "2012 UK Employee Dishonesty Notification").

It is further understood and agreed that, in the event of *us* ultimately making payment to *you* in respect of the "2012 UK Employee Dishonesty Notification" an Additional Annual Premium of USD 5,000 shall become payable to this Policy.

All other terms and Conditions shall remain unchanged.

**Endorsement 6 – Difference in Conditions**


It is understood and agreed that should this insurance be narrower in terms and conditions than any afforded previously under Comprehensive Crime coverage of policy no. L11724991 issued by Lloyd's Syndicate CGM 2488 and other subscribing insurers then this policy shall be construed or rectified to offer identical coverage to such previous insurance(s).

Subject however, to no previous term or condition being expressly excluded under this policy.

All other terms and conditions remain unchanged.

CHUBB°

Chubb. Insured.™

# EXHIBIT B



# CONTRACT DOCUMENTATION





Date: 23 May 2018

**JLT Specialty Limited**

The St Botolph Building
138 Houndsditch
London EC3A 7AW

Tel    +44 (0)20 7528 4000
Fax   +44 (0)20 7528 4500
Our contact Helen Robertson

The Brink's Company
1801 Bayberry Court
PO Box 18110
Richmond
VA 23226-8100
USA

EOC No: LI1831111

# Evidence of Cover

Dear Sirs,

**Insured:**          The Brink's Company

**Period:**           01 April 2018 to 1 April 2019 both days at 12.01 am Local Standard
                      Time at the principal address of the insured

**Type:**             First Excess Comprehensive Crime Insurance

**Order Hereon:**     100%

(Please refer to contract for full details of cover)

In accordance with your instructions, we have effected insurance for your account as set out
in the enclosed copy Contract Documentation.

Our Debit Note reflecting the premium due for the insurance is additionally enclosed for your
attention.  In order to meet the premium payment terms set by Insurers, the premium needs
to be paid to us by no later than the date set out in the Debit Note.

**Reminder: Duty of Disclosure**

Under the laws of England and Wales, Scotland and Northern Ireland, JLT Specialty Limited
has a duty to remind you of a policyholder's (and its insurance agent's) duty to make a fair
presentation of the risk, and to disclose all material circumstances, and the consequences of
not doing so.  It is necessary to disclose all information which would influence the judgement
of a prudent insurer in determining whether or not to accept a risk, and upon what
terms.  Failure to comply with this duty may give the insurer the right to void the policy from
its inception, or to impose different terms, or to reduce the amount paid on any claim. If your
contract is not subject to such laws, your duty of disclosure and the consequences of its
breach may vary from that stated above.

Page 1 of 3

Lloyd's Broker, Authorised and regulated by the Financial Conduct Authority
A member of the Jardine Lloyd Thompson Group. Registered Office: The St Botolph Building, 138 Houndsditch, London EC3A 7AW.
Registered in England No. 01536540. VAT No. 244 2321 96





Continuation of Evidence of Cover: LI1831111 dated 23 May 2018

For further information please refer to our Business Protocol document which can be found on-line at https://www.jltspecialty.com/business-protocols and if any further material requires to be disclosed or if you have any question as to what should be disclosed please refer to your normal JLT Specialty Limited contact.

We would ask you to examine the enclosed documents carefully and if for any reason they are incorrect contact us immediately.

Yours faithfully,
For and on behalf of JLT Specialty Limited

Authorised Signatory



Continuation of Evidence of Cover: LI1831111 dated 23 May 2018

## Security Schedule

**Insured with:**

| | |
|---|---|
| 37.5000% | Lloyd's Syndicate 1886 |
| | AA1120054 |
| 25.0000% | Lloyd's Syndicate 1492 |
| 25.0000% | Lloyd's Syndicate 4472 |
| | AA1126006 |
| 12.5000% | Lloyd's Syndicate 2003 |
| | AA1128003 |
| **100.0000%** | |

This Security Schedule has been prepared by us for your ease of reference to identify the subscribing Insurers and their respective participations (as a percentage of our order) on the above referenced insurance contract.  Please note that this schedule is not authorised by the subscribing Insurers



## JLT Specialty Limited

| Policy No | | | | | 901 |
|---|---|---|---|---|---|
| B0901LI1831111000 | | | | | JLT |

|  | | R/I | BKR | LISTS | |
|---|---|---|---|---|---|
| **Market Reform Contract** | | YES | NO | | YES | NO |
| | | DATE | DATE | DATE | |

**Insured**

The Brink's Company

**Period**

01 April 2018 to 01 April 2019 both days at 12.01 am Local Standard Time at the Principal Address of the Insured.

**Risk**

First Excess Crime Insurance

**For LLOYD's use**

**For IUA use**

**For LIRMA use**

JI.TSL Auth: my5

HMT/HR9/18 April 2018/LI1831111

7 1 0 6 2 4 4 9 0 1 2



| | | **901** |
|---|---|---|
| | B0901LI1831111000 | **JLT** |
| | | Page 1 of 14 |

## RISK DETAILS

**Unique Market Reference:** B0901LI1831111000

**Attaching to**
**Line-slip reference:**     B0901LI1726755000 Reference - 2595/17

**Type:**                   First Excess Comprehensive Crime Insurance

**Insured:**                The Brink's Company

**Principal Address:**      1801 Bayberry Court
                           PO Box 18110
                           Richmond
                           VA 23226-8100
                           USA

**Period:**                 From:  01 April 2018
                           To:    01 April 2019

                           both days at 12:01am Local Standard Time at the Principal Address of
                           the Insured.

**Interest:**               First Excess Comprehensive Crime Insurance and as more fully
                           defined within the Policy Wording.

**Limit(s) of Liability:**  USD 40,000,000 each single loss

                           Excess of:

                           USD 10,000,000 each single loss

**Underlying Primary**
**Deductible:**             USD 100,000 each and every loss

                           USD 250,000 each and every loss in respect of social engineering
                           fraud

                           USD 1,000 each and every loss in respect of credit card forgery

**Territorial Limits:**     Worldwide

 **JLT**

| B0901LI1831111000 |
|---|

**901**
**JLT**
Page 2 of 14

---

**Jurisdictional Limits:**     United States of America

**Conditions:**     Wording Excess Crime Policy Wording and Endorsements as attached
to be agreed Contract Leader only, plus;

Special Cancellation Clause as attached hereto.

BREXIT Continuity Clause as attached

It is hereby understood and agreed by any and all underwriters
subscribing to this insurance that any subjectivity that has been raised
within a quote MRC or quote sheet or otherwise shall be treated as
having no application if not included within this final placement MRC. It
is incumbent on underwriters to ensure inclusion within the provisions
of the final placement MRC any subjectivity which they wish to apply to
the cover

**Notices:**     Virginia Notice to the Insured to be affixed by Thomas E. Sears, Inc.

**Choice of Law and**
**Jurisdiction:**

**Law:**     the Laws of the Commonwealth of Virginia, USA.

**Jurisdiction:**     per LMA 5020 Service of Suit Clause naming
Mendes & Mount, New York for service of process.

**Arbitration:**     American Arbitration as more fully defined as per the Primary Policy
Wording.

**Premium:**     USD 104,850

**Premium Payment Terms:** LSW 3001 - 60 days.

**PREMIUM PAYMENT CLAUSE**
Notwithstanding any provision to the contrary within this contract or any
endorsement hereto, in respect of non-payment of premium only the
following clause will apply.

The (Re)Insured undertakes that premium will be paid in full to
(Re)Insurers within 60 days of inception of this contract (or, in respect
of instalment premiums, when due).

If the premium due under this contract has not been so paid to
(Re)Insurers by the 60th day from the inception of this contract (and, in
respect of instalment premiums, by the date they are due) (Re)Insurers
shall have the right to cancel this contract by notifying the (Re)Insured
via the broker in writing.  In the event of cancellation, premium is due to

---

 JLT

| B0901LI1831111000 |

**901**
**JLT**
Page 3 of 14

(Re)Insurers on a pro rata basis for the period that (Re)Insurers are on risk but the full contract premium shall be payable to (Re)Insurers in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this contract.

It is agreed that (Re)Insurers shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker. If premium due is paid in full to (Re)Insurers before the notice period expires, notice of cancellation shall automatically be revoked. If not, the contract shall automatically terminate at the end of the notice period.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

30/09/08
LSW3001

**Taxes Payable by Insured and administered by Insurers:**

As per the attached tax schedule.

**Recording, Transmitting & Storing information:**

Where JLT Specialty Limited maintains risk and claim data / information / documents JLT Specialty Limited may hold data / information / documents electronically.

**Insurer Contract Documentation:**

This document details the contract terms entered into by the insurer(s) and constitutes the contract document.

This contract is subject to US state surplus lines requirements. It is the responsibility of the surplus lines broker to affix a surplus lines notice to the contract document before it is provided to the insured. In the event that the surplus lines notice is not affixed to the contract document the insured should contact the surplus lines broker.

 JLT

| B0901LI1831111000 |

**901**
**JLT**
Page 4 of 14

In respect of the participation of Lloyd's Underwriters Insurance Business in Canada the following clauses attach to the contract:

### INTENTION FOR AIF TO BIND CLAUSE

Whereas Lloyd's Underwriters have been granted an order to insure in Canada risks under the Insurance Companies Act (Canada) and are registered in all provinces and territories in Canada to carry on insurance business under the laws of these jurisdictions or to transact insurance in these jurisdictions.

And whereas applicants for insurance coverage in respect of risks located in Canada and Canadian Cedants wish that Lloyd's insurance and reinsurance coverage be provided in a manner that requires Lloyd's Underwriters to vest assets in trust in respect of their risks pursuant to the Insurance Companies Act (Canada);

a) The Canadian Endorsement attached to this Contract shall be in force and shall be the governing contract pending the decision by Lloyd's Underwriters' attorney and chief agent in Canada (the "AIF") to confirm coverage in accordance with both the terms and conditions set out in this Canadian Endorsement and applicable Canadian law;

b) The AIF shall confirm Lloyd's Underwriters' coverage by signing in Canada a policy that will contain the terms and conditions set out in the attached Canadian Endorsement (the "Canadian Policy"), and by communicating from Canada the issuance of that policy to the policyholder or his broker;

c) The attached Canadian Endorsement shall cease to have effect upon the communication by the AIF from Canada of the Canadian Policy to the policyholder or his broker, and the Canadian Policy will replace and supersede the endorsement.

01/11/11
LMA5181



| | 901 |
| B0901LI1831111000 | JLT |
| | Page 5 of 14 |

## CANADIAN ENDORSEMENT

(hereinafter referred to as the "Canadian Endorsement")

attaching to the

First Excess Crime Insurance

commencing 01 April 2018

(hereinafter referred to as the "Global Contract")

Between

The Brink's Company

as more particularly described in the Global Contract

(hereinafter referred to as the "Insured")

and

VARIOUS UNDERWRITERS AT LLOYD'S, LONDON

(hereinafter referred to as "Lloyd's Underwriters")

UMR Ref: B0901LI1831111000

The coverage provided under this Canadian Endorsement is intended to cover the Canadian portion of the risks that would otherwise be insured by the Lloyd's Underwriters under the Global Contract, for the period specified therein (the "Canadian risks") and for which the Underwriters have allocated a Premium of 3.143% part of the premium payable under the Global Contract.

The insurance of such Canadian risks has been effected for and on behalf of certain Lloyd's Underwriters, whose definitive numbers and the proportions underwritten by them can be ascertained by reference to the Global Contract.

The said Lloyd's Underwriters are hereby bound, severally and not jointly, to insure in accordance with the terms and conditions contained herein and within the Global Contract and this Canadian Endorsement shall incorporate all terms, conditions and limitations in the Global Contract relating to the operation of cover in respect of the Canadian risks.

It is hereby agreed that the interests and liabilities of the Lloyd's Underwriters for the Canadian risks insured under the Global Contract are as more particularly described in the Global Contract. Notwithstanding any provision to the contrary in the Global Contract, the total liability of the Lloyd's Underwriters under this Canadian Endorsement and the Global Contract shall not exceed their proportion of the total insurance coverage amount specified in the Global Contract and liability under this Canadian Endorsement for the Canadian risks remains limited by the provisions of the Global Contract.



Any payment by the Lloyd's Underwriters under this Canadian Endorsement shall reduce by that amount the total liability of the Lloyd's Underwriters under the Global Contract. Any payment by the Lloyd's Underwriters under the Global Contract shall reduce by that amount the total liability of the Lloyd's Underwriters under this Canadian Endorsement.

The governing law of this Canadian Endorsement shall be as determined by the Global Contract.

References in this Canadian Endorsement to the "Global Contract" shall refer to the Global contract identified by the UMR referenced above and shall include any subsequent issued insurer authorised evidence of cover.

Canadian Endorsement signed for and of behalf of Lloyd's Underwriters

**01/11/11**
**LMA3105 (amended)**



| B0901LI1831111000 |

**901**
**JLT**
Page 7 of 14

**Contract Change**
**Documentation:**

The Contract change document(s) signed by the insurers shall form the evidence of the changes agreed.

**Notice of**
**Cancellation:**

Where (Re)insurers have the right to give notice of cancellation in accordance with the provisions of the Contract, then:

- To the extent provided by the Contract, the Contract Leader is authorised to issue such notice on behalf of all participating insurers; and (optionally)

- Any (Re)insurer may issue such notice in respect of its own participation



| B0901LI1831111000 |
|---|

**901
JLT**

Page 8 of 14

## INFORMATION

Information made available to and seen by all subscribing Insurers hereon includes the following:

Chubb Fraud Protector Proposal Form signed and dated 2 December 2018 (07 pages).

GL Values Comparison 2016/2017 (12 MB)

Employees per Country (6 MB)

Revenue, Headcount and Payroll by Country (197 KB)

 **JLT**

| B0901LI1831111000 |

**901**
**JLT**
Page 9 of 14

## SPECIAL CANCELLATION CLAUSE

In the event that an Insurer:

a)   ceases underwriting; or

b)   is the subject of an order or resolution for winding up or formally proposes as scheme of arrangement; or

c)   has its authority to carry on insurance business withdrawn; or

d)   has its financial strength rating reduced by A.M. Best's, Standard & Poor's or equivalent rating agency to less than A-;

the Insured may terminate the Insurer's participation on this risk forthwith by giving notice and the premium payable to the Insurer shall be pro rata to the time on risk. In the event there are any notified, reserved or paid losses or circumstances, premium shall be deemed fully earned. Any return of premium shall also be subject to a written full release of liability from the Company.

NMA2957 (amended)



B0901LI1831111000

## BREXIT CONTINUITY CLAUSE

**Notice of Cancellation**

Notwithstanding anything contained in this Contract to the contrary, if a 'Default Event' occurs in relation to any (Re)Insurer, the (Re)Insured shall have the right to give revocable notice of cancellation of the participation of that (Re)Insurer in this Contract.
In the event of such notice being given then cancellation shall be effective from the "Final Brexit Date" as hereinafter defined unless revoked earlier by the (Re)Insured.  To be effective, any notice of cancellation by the (Re)Insured  (or by JLT Specialty Limited on its behalf) under this General Condition shall be deemed delivered and effective if delivered in writing to the addressee set out in the notice provisions of this Contract, or in the absence of such provision to the registered office of the (Re)Insurer whose participation is being cancelled. Within fourteen (14) days of the effective date of any cancellation:

    (a) the relevant (Re)Insurer shall return any paid but unearned premium; and
    (b) the (Re)Insured shall pay any unpaid but earned premium,

and unearned premium shall be calculated on a pro-rata basis for the time on risk, notwithstanding anything expressly provided in this Contract to the contrary, including in any cancellation or termination provisions.  Such (Re)Insurer shall, notwithstanding cancellation hereunder, remain liable for the payment of all claims arising under this Contract prior to the date of cancellation and shall use its best endeavours to pay such claims prior to the Final Brexit Date.
**A Default Event**

A 'Default Event' shall be deemed to be and to have occurred in respect of a (Re)Insurer participating in this Contract if, 45 calendar days prior to the later of:

(a) the 29th March 2019; or
(b) where a Brexit transition agreement has been effected pursuant to which (Re)Insurers remain able to conduct business as its relates to this Contract, such subsequent date as may be specified for the full departure of the United Kingdom from the European Union under such transition agreement  (such later date being the "Final Brexit Date"), that (Re)Insurer has not provided  written confirmation to JLT Specialty Limited that either

    (i)    its relevant licence to conduct business as it relates to this Contract will remain valid beyond the Final Brexit Date, or
    (ii)   a transfer of its participation to a replacement (Re)Insurer pursuant to the Transfer Option below has been completed.

**Transfer Option**

It is an obligation of each individual subscribing (Re)Insurer (hereinafter referred to as the "Exiting (Re)Insurer") to this Contract to ensure that the (re)insurance protection afforded to the (Re)Insured is unaffected by a Default Event.



B0901LI1831111000

**901
JLT**

Page 11 of 14

An Exiting (Re)Insurer shall, to avoid a Default Event, have the right, and obligation to use its best endeavours, to transfer its participation to a suitable replacement (Re)Insurer holding all necessary licences and permissions to grant (re)insurance coverage provided that the replacement (Re)Insurer:

1) must accept the full participation of the Exiting (Re)Insurer on the same terms (including premium), conditions, limitations and exclusions; and
2) must have a security grading not less than that of the Exiting (Re)Insurer as issued by Standard & Poor's Insurance Rating (a division of the Mcgraw-Hill Companies) or successor thereof or Moody's or AM Best Company Inc. or successor thereof unless agreed otherwise by the (Re)Insured; and
3) such transfer is to be completed at least 45 calendar days prior to the Final Brexit Date; and
4) accepts responsibility for the payment of all claims arising under this Contract other than those settled prior to the date of replacement of the Exiting (Re)Insurer.

The (Re)Insured shall cooperate reasonably to enable the Exiting (Re)Insurer to effect a transfer on the above terms.


**(Re)Insurers' Duty**


If any (Re)Insurer is affected by a Default Event it shall:

(a) at its own expense ensure compliance with this General Condition.  Such expense shall take into account the general market conditions at the time of any such transfer or cancellation along with any additional fees for additional work incurred by the (Re)Insured and JLT Specialty Limited;
(b) not to use the doctrine of Frustration of Contract as a mechanism to avoid its obligation to provide a suitable, lawful alternative (re)insurance protection to the (Re)Insured.

(Re)Insurers liability to the (Re)Insured under this General Condition shall remain several and not joint.



B0901LI1831111000

**901**
**JLT**
Page 12 of 14

## SECURITY DETAILS

**(Re)insurer's Liability:**

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

LMA3333
21 June 2007



| B0901LI1831111000 | **901**<br>**JLT**<br>Page 13 of 14 |

**Order Hereon:**  100% of 100%

**Basis of Written Lines:**  Percentage of Whole

**Signing Provisions:**  In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the Insurers.

However:

a) in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

b) the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the Insured and all Insurers whose lines are to be varied. The variation to the contracts will take effect only when all such Insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

Notwithstanding the foregoing, in the event of late placement and where there is no specific instruction from the Insured to sign lines disproportionately, the Insured and all Insurers whose lines are not written "To Stand" agree to sign proportionately irrespective of the date on which their line was committed. Signing bureaux are authorised to accept signed lines calculated by JLT Specialty Limited without further agreement or endorsement.

**WRITTEN LINES:**  In a co-insurance placement, following Insurers may, but are not obliged to, follow the premium charged by the leading insurer, other than supporting insurers under a Lineslip who agree to be bound at the terms charged by the leading insurer of the Line-slip.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

 **JLT**

| B0901LI1831111000 |

**901**
**JLT**
Page 14 of 14

**WRITTEN LINES**

**JLT SPECIALTY LIMITED**
LINESLIP REFERENCE 2595/17
RISKS ATTACHING
01 May 2017 TO 30 April 2018
CERTIFICATE NO. LI1726755

As per attached Security Details.

## The Brinks Company

First Excess Crime Insurance - LI1831111

Period: 01 April 2018 to 01 April 2019 both days at 12.01 am of Local Standard Time
Total Headcount: 62,002
Premium: 104,850.00
Currency: USD

| Country | Data Split by Country | % of Total | Premium Apportionment | Rate of Tax | Tax Payable |
|---|---|---|---|---|---|
| Argentina | 2972 | 4.793% | 5,025.87 | 0.00% | 0.00 |
| Australia | 52 | 0.084% | 87.94 | -3.00% | -2.64 |
| Bahrain | 1 | 0.002% | 1.69 | 0.00% | 0.00 |
| Belgium | 61 | 0.098% | 103.16 | 9.25% | 9.54 |
| Bolivia | 573 | 0.924% | 968.99 | 0.00% | 0.00 |
| Botswana | 13 | 0.021% | 21.98 | 0.00% | 0.00 |
| Brazil | 10,252 | 16.535% | 17,336.90 | 0.00% | 0.00 |
| Canada* | 1,949 | 3.143% | 3,295.90 | * | * |
| Chile | 2,070 | 3.339% | 3,500.52 | 0.00% | 0.00 |
| China | 115 | 0.185% | 194.47 | 0.00% | 0.00 |
| Colombia | 4,574 | 7.377% | 7,734.97 | 0.00% | 0.00 |
| France | 5,548 | 8.948% | 9,382.08 | 9.00% | 844.39 |
| Germany | 81 | 0.131% | 136.98 | 19.00% | 26.03 |
| Greece | 2,281 | 3.679% | 3,857.34 | 15.00% | 578.60 |
| Hong Kong | 749 | 1.208% | 1,266.61 | 0.00% | 0.00 |
| India | 3,149 | 5.079% | 5,325.19 | 0.00% | 0.00 |
| Israel | 594 | 0.958% | 1,004.50 | 0.00% | 0.00 |
| Italy | 6 | 0.010% | 10.15 | 22.25% | 2.26 |
| Japan | 61 | 0.098% | 103.16 | 0.00% | 0.00 |
| Jordan | 132 | 0.213% | 223.22 | 0.00% | 0.00 |
| Kenya | 2 | 0.003% | 3.38 | 0.00% | 0.00 |
| Korea (South) | 16 | 0.026% | 27.06 | 9.00% | 2.44 |
| Luxembourg | 929 | 1.498% | 1,571.01 | 4.00% | 62.84 |
| Macau | 52 | 0.084% | 87.94 | 0.00% | 0.00 |
| Madagascar | 182 | 0.294% | 307.78 | 0.00% | 0.00 |
| Mauritius | 2,571 | 4.147% | 4,347.75 | 0.00% | 0.00 |
| Mexico | 9,319 | 15.030% | 15,759.12 | 0.00% | 0.00 |
| Morocco | 821 | 1.324% | 1,388.37 | 0.00% | 0.00 |
| Panama | 606 | 0.977% | 1,024.79 | 0.00% | 0.00 |
| Poland | 3 | 0.005% | 5.07 | 0.00% | 0.00 |
| Reunion Islands | 347 | 0.560% | 586.80 | 9.00% | 52.81 |
| Russia | 305 | 0.492% | 515.78 | 0.00% | 0.00 |
| Singapore | 230 | 0.371% | 388.95 | 0.00% | 0.00 |
| South Africa | 109 | 0.176% | 184.33 | 0.00% | 0.00 |
| Switzerland** | 62 | 0.100% | 104.85 | 0.00% | 0.00 |
| Taiwan | 34 | 0.055% | 57.50 | 0.00% | 0.00 |
| Thailand | 80 | 0.129% | 135.29 | 0.00% | 0.00 |
| Turkey | 59 | 0.095% | 99.77 | 0.00% | 0.00 |
| United Arab Emirates | 151 | 0.244% | 255.35 | 0.00% | 0.00 |
| UK | 183 | 0.295% | 309.47 | 12.00% | 37.14 |
| USA | 6,972 | 11.245% | 11,790.17 | 0.00% | 0.00 |
| Venezuela | 3,722 | 6.003% | 6,294.18 | 0.00% | 0.00 |
| Vietnam | 14 | 0.023% | 23.68 | 0.00% | 0.00 |
| | 62,002 | 100.000% | 104,850.00 | | £1,613.40 |

* See separate schedule (attached) for Canadian Taxes

** Taker of insurance is of non-Swiss origin, and so no Swiss Stamp Duty is applicable

**Notice to Insurer(s)**

This schedule is a prepared apportionment of Premium only, calculated on a prorata basis agreed between Insurers and the Insured, and utilising rates that JLT Specialty believe to be correct as at the date of issue of this schedule.  The purpose of this schedule is to assist Insurers in establishing  an apportionment of Premium for taxation and legislative purposes.  This schedule in no way changes Insurers responsibility for making this apportionment correct and/or ensuring that the correct tax rates are applied.  JLT Specialty Limited disclaims all and any liability to any party from use or reliance on this schedule, which is at Insurers sole risk.

**Notice to Policyholder**

If a tax or charge payable by Insurers is allowed to be deducted by you from the Premium payable, it is your responsibility to ensure that it is remitted to the appropriate authority. Alternatively, where you pay premiums to an Insurer not located in the same country where you and / or your risks are located, the local tax jurisdiction may have enacted legislation that requires you to calculate tax on the premium and remit the taxes to the appropriate authority. We are not able to advise you with regard to any tax or charge that you are required to remit to a tax authority and therefore strongly advise that you check the tax and regulatory position with regard to the use of Insurers for non-UK risks.

**The Brink's Company - First Excess Crime Insurance - LI1831111**

All amounts in USD

Canadian Total: 1,949
Canadian Premium Proportion: 3,296.90

| Province | Data Split | % of Total | Proportion of Premium (£) | Federal Excise Tax | Paid directly by Assured to Canadian Tax Authorities in addition to premium | Provincial Premium Tax | | Retail Sales Tax | |
|---|---|---|---|---|---|---|---|---|---|
| Canada (Alberta) | 189 | 9.6973% | 319.61 | 10.00% | 31.96 | 4.00% | 12.78 | | |
| Canada (British Colombia) | 267 | 13.6993% | 451.62 | 10.00% | 45.15 | 4.00% | 18.06 | | |
| Canada (Manitoba) | 66 | 3.3380% | 109.92 | 10.00% | 10.99 | 3.00% | 3.30 | 8.00% | 8.79 |
| Canada (New Brunswick) | 31 | 1.5906% | 52.42 | 10.00% | 5.24 | 3.00% | 1.57 | | |
| Canada (Newfoundland) | 24 | 1.2314% | 40.59 | 10.00% | 4.06 | 5.00% | 2.03 | 15.00% | 6.09 |
| Canada (Nova Scotia) | 77 | 3.9507% | 130.21 | 10.00% | 13.02 | 4.00% | 5.21 | | |
| Canada (Northwest Territories) | 5 | 0.2886% | 8.51 | 10.00% | 0.85 | 3.00% | 0.26 | | |
| Canada (Ontario) | 1,046 | 53.6686% | 1,768.86 | 10.00% | 176.89 | 3.00% | 53.07 | 8.00% | 141.51 |
| Canada (Prince Edward Island) | 4 | 0.2062% | 6.76 | 10.00% | 0.68 | 4.00% | 0.27 | | |
| Canada (Quebec) | 181 | 9.2868% | 306.08 | 10.00% | 30.61 | 3.48% | 10.65 | 9.00% | 27.55 |
| Canada (Saskatchewan) | 51 | 2.62% | 86.24 | 10.00% | 8.62 | 4.00% | 3.45 | 6.00% | 5.17 |
| Canada (Yukon) | 9 | 0.46% | 15.22 | 10.00% | 1.52 | 2.00% | 0.30 | | |
| Totals | 1,949 | 100.00% | 3,296.90 | | 329.59 | | 110.95 | | 189.11 |

**Notice to Insurer(s)**

This schedule is a prepared apportionment of Premium only, calculated on a prorata basis agreed between Insurers and the Insured, and utilising rates that JLT Specialty believe to be correct as at the date of issue of this schedule. The purpose of this schedule is to assist Insurers in establishing an apportionment of Premium for taxation and legislative purposes. This schedule in no way changes Insurers responsibility for making this apportionment correct and/or ensuring that the correct tax rates are applied. JLT Specialty Limited disclaims all and any liability to any party from use or reliance on this schedule, which is at Insurers sole risk.

**Notice to Policyholder**

If a tax or charge payable by Insurers is allowed to be deducted by you from the Premium payable, it is your responsibility to ensure that it is remitted to the appropriate authority. Alternatively, where you pay premiums to an insurer not located in the same country where you and / or your risks are located, the local tax jurisdiction may have enacted legislation that requires you to calculate tax on the premium and remit the taxes to the appropriate authority. We are not able to advise you with regard to any tax or charge that you are required to remit to a tax authority and therefore strongly advise that you check the tax and regulatory position with regard to the use of Insurers for non-UK risks.

This contract is subject to US state surplus lines requirements.  It is the responsibility of the surplus lines broker to affix a surplus lines notice to the contract document before it is provided to the insured.  In the event that the surplus lines notice is not affixed to the contract document the insured should contact the surplus lines broker

## EXCESS CRIME POLICY

POLICY NUMBER: B0901/LI1831111

**Item 1 Policyholder:**          The Brink's Company

**Item 2 Principal Address:**     1801 Bayberry Court
                                  PO Box 18110
                                  Richmond
                                  Virginia 23226-8100
                                  USA

**Item 3 Limit of Liability**     USD 40,000,000 each single loss

**Item 4 Underlying Insurance**

                                  **Primary Policy**

                                  Insurer                  Lloyd's Syndicate CGM 2488

                                  Policy Number            B0901/LI1831110

                                  Limit of Liability:      USD 10,000,000 each and every loss

                                  Underlying Primary Deductible: As detailed in the Primary Policy
                                  Schedule

**Item 5 Policy Period**          From:   01 April 2018
                                  To:     01 April 2019
                                  Both days at 12:01 am Local Standard Time at the address in item
                                  2 above

**Item 6 Annual Premium**         USD 104,850

**Item 7 Territorial Limits**     Worldwide

**Item 8 Jurisdictional Limits**  USA

_____
For and on behalf of the Company

In consideration of the payment of the premium and subject to the Declarations made a part hereof the **Company** and the **Policyholder** agree as follows:

**Insuring Clause**

1.   The **Company** shall provide the **Insured** with insurance during the **Policy Period** excess of the **Underlying Limit**. Such excess insurance shall attach only after the **Underlying Limit** for each loss has been **Exhausted.**

Cover hereunder shall then apply in accordance with the terms and conditions of the **Primary Policy** and any more restrictive terms and conditions of any other policy designated in Item 4(B) of the Declarations, except as otherwise provided herein.

**Policy Definitions**

2.   When used in this Policy:

**Company** means those insurers subscribing to this policy.

**Exhausted** or **Exhaustion** means a situation where payment by the insurers of the **Underlying Insurance** for a covered loss as a result of a covered claim has resulted in total exhaustion of the **Underlying Limit.**

In the event of financial impairment or insolvency of any insurer of the **Underlying Insurance** any unpaid loss shall not be covered under this Policy but shall be retained by the **Policyholder.**

**Insured** means any natural person defined as being insured under the **Primary Policy.** Where there is more than one insured under the **Primary Policy,** for the purposes of this Policy all insureds are insured jointly and for their joint interests.

**Limit of Liability** means the **Company's** maximum aggregate liability for each covered loss under this Policy as set forth in Item 3 of the Declarations.

**Policyholder** means the company designated in Item 1 of the Declarations.

**Primary Policy** means the policy scheduled in Item 4(A) of the Declarations or any policy of the same insurer replacing or renewing such policy.

**Policy Period** means the period of time specified in Item 5 of the Declarations, subject to prior termination in accordance with Section 9, Policy Termination, below. If a right to any discovery period is exercised, such extension shall be treated as set forth in the **Primary Policy.**

**Underlying Insurance** means all policies scheduled in Item 4 of the Declarations and any policies of the same insurers replacing or renewing them.

**Underlying Limit** means the amount equal to the aggregate of all limits of liability for each loss as set forth in Item 4 of the Declarations for all **Underlying Insurance** plus any applicable retention and/or deductible under the **Primary Policy.**

**Maintenance of Underlying Insurance**

3.   It is a condition precedent to the liability of the **Company** hereunder that the **Underlying Insurance** shall be maintained in full effect during the **Policy Period.**

**Claim Notice and Participation**

4.   It is a condition precedent to the **Company's** liability hereunder, that the **Insured** gives to the **Company** written notice as soon as practicable of any claim under the **Underlying Insurance.**

At the **Company's** request, the **Insured** shall provide full co-operation to the **Company** in all matters relating to any loss or claim (including access to any partner, director, officer, trustee or

employee), and shall produce for the **Company's** inspection any and all records and at such reasonable times and places as the **Company** shall designate.

**Subrogation -- Recoveries**

5.  The **Company** shall be subrogated to the extent of any payment made under this **Policy** to all the **Insured's** rights of recovery and the **Insured** undertakes not to prejudice the **Company's** interests or its potential or actual rights of recovery and shall do everything necessary to secure and preserve such rights.

    Any amounts recovered after payment of loss hereunder shall be apportioned in the inverse order of payment to the extent of actual payment. The expenses of all recovery proceedings shall be apportioned among the recipients in the ratio of their respective recoveries.

**Notice**

6.  Notice to the **Company** under this **Policy** shall be given in writing, addressed to:

    Notice of claim or circumstances:
    All other notices:                          The Company via:
                                                JLT Specialty Ltd
                                                The St Botolph Building
                                                138 Houndsditch
                                                London, EC3A 7AW

    Such notice shall be effective on the date of receipt by the **Company** at such address.

**Company Authorisation Clause**

7.  By acceptance of this **Policy**, the **Policyholder** named in Item 1 of the Declarations agrees to act on behalf of the **Insured** with respect to the giving or receiving of any notice provided for under this **Policy**, including claims and termination, the payment of premiums, the receiving of any return premiums which become due under this **Policy** and the negotiation, agreement to and acceptance of endorsements, and the **Policyholder** hereby represents that the **Insureds** have consented to its acting on their behalf.

**Alterations**

8.  No amendment, or assignment of interest, under this **Policy** shall be effective unless made by endorsement to this **Policy** signed by an authorised employee of the **Company**. The **Insured** shall also give to the Company written notice as soon as practicable of any additional or return premiums charged or paid in connection with any **Underlying Insurance**.

**Policy Termination**

9.  This **Policy** shall terminate notwithstanding its other terms:

    (a)  thirty days after receipt by the **Policyholder** of a written notice of cancellation from the **Company** as a result of non-payment of premiums within the agreed terms of credit, or

    (b)  immediately upon:

         (i)   receipt by the **Company** of written notice of cancellation or termination of this **Policy** from the **Policyholder**; or

         (ii)  cancellation or termination of the **Underlying Insurance**.

    The **Company** shall refund the unearned premium computed at customary short rates if this **Policy** or any **Underlying Insurance** is terminated by the **Policyholder** (unless otherwise agreed).

**Choice of Law and Forum**

10.     **Law:**    the Laws of the Commonwealth of Virginia, USA

       **Jurisdiction:**    per LMA 5020 Service of Suit Clause naming Mendes & Mount, New York
                           for service of process.

       **Arbitration:**    American Arbitration as more fully defined in the Primary Policy Wording
                           B0901/LI1831110

<u>ENDORSEMENT ATTACHING TO POLICY NO. B0901 / LI1831111000</u>

### SERVICE OF SUIT CLAUSE (U.S.A.)

This Service of Suit Clause will not be read to conflict with or override the obligations of the parties to arbitrate their disputes as provided for in any Arbitration provision within this Policy.  This Clause is intended as an aid to compelling arbitration or enforcing such arbitration or arbitral award, not as an alternative to such Arbitration provision for resolving disputes arising out of this contract of insurance (or reinsurance).

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States.  Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon

Mendes & Mount, 750 7th Avenue, New York 10019 6829, USA

and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom

may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

14/09/2005
LMA5020

Form approved by Lloyd's Market Association

### MANUSCRIPT ENDORSEMENT

It is hereby noted and agreed that Brink's Sicherheit GmbH (Germany) is excluded from this policy.

All other terms, clauses and conditions remain unaltered.

### SANCTION LIMITATION AND EXCLUSION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

15/09/10
LMA3100

### MANUSCRIPT ENDORSEMENT

It is hereby noted and agreed that Social Engineering Fraud as detailed in the Primary policy number LI1831110 does not apply to this policy.

All other terms, clauses and conditions remain unaltered.

Policy Number: (UMR) B0901LI1831111

## SECURITY DETAILS

REFERENCES
UMR (Unique Market Reference): B0901LI1831111
Date contract printed to PDF: 09:50 26 April 2018

## SIGNED UNDERWRITERS

QBE European Company Operations
Claire Ribbins

| | | | |
|---|---|---|---|
| **Written Line** | 37.5% | **Signed Line** | 37.5% |
| Agreed on | 09:24 20 April 2018 | | |
| For and on behalf of: | | **Written Line** | **Signed Line** |
| **Lloyd's Underwriter Syndicate No. 1886, London, England** | | 37.5% | 37.5% |
| Bound as Slip Leader, Lloyd's Leader | | | |

|  | | |
|---|---|---|
| *Lloyd's Stamp:* | 1886 | |
| *LORS Code:* | L1886 | |
| *Reference:* | 18MA312557XA | |
| *Description:* | | |

Probitas Syndicate 1492
Mark Smith

| | | | |
|---|---|---|---|
| **Written Line** | 25.00% | **Signed Line** | 25.00% |
| Agreed on | 09:04 20 April 2018 | | |
| For and on behalf of: | | **Written Line** | **Signed Line** |
| **Lloyds Stamp Probitas 1492** | | 25.00% | 25.00% |
| Bound | | | |

|  | | |
|---|---|---|
| *Lloyd's Stamp:* | 1492 | |
| *LORS Code:* | L1492 | |
| *Reference:* | FD957X18A000 | |
| *Description:* | | |

JLT Specialty Limited
The St Botolph Building
138 Houndsditch
London EC3A 7AW
Tel      +44 (0)20 7528 4000
Fax      +44 (0)20 7528 4500
www.jltspecialty.com



Lloyd's Broker. Authorised and regulated by the Financial Conduct Authority.
A member of the Jardine Lloyd Thompson Group. Registered Office:
The St Botolph Building, 138 Houndsditch, London EC3A 7AW.
Registered in England No. 01536540. VAT No. 244 2321 96.

